**Case No. 15-1479**

_____

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

_____

GIANNI-PAOLO FERRARI

Plaintiff–Appellant

v.

FORD MOTOR COMPANY

Defendant–Appellee

On Appeal from the United States District Court
Eastern District of Michigan
USDC Case No. 13-cv-14857
Hon. Judith E. Levy

**<u>APPELLANT'S BRIEF</u>**

**Oral Argument Requested**

**Certificate of Service**

Charlotte Croson (P56589)
NACHTLAW, P.C.
Attorney for Plaintiff-Appellant
101 North Main Street
Suite 555
Ann Arbor, MI 48104
(734) 663-7550
f (734) 663-7592
ccroson@nachtlaw.com

## <u>CORPORATE DISCLOSURE FORM</u>

Pursuant to 6th Cir. R. 26.1, Plaintiff-Appellant GIANNI-PAOLO FERRARI makes the following disclosure:

1.      Is said party a subsidiary or affiliate of a publicly owned corporation?

No.


2.      Is there a publicly owned corporation, not party to the appeal, who has a financial interest in the outcome?

No.

# TABLE OF CONTENTS

**CORPORATE DISCLOSURE FORM** ................................................................. i

**TABLE OF AUTHORITIES** ................................................................. iv

**STATEMENT IN SUPPORT OF ORAL ARGUMENT** ................................ VII

**JURISDICTIONAL STATEMENT** ................................................................. 1

**STATEMENT OF ISSUES** ................................................................. 2

**STATEMENT OF THE CASE** ................................................................. 4

   **I.**    **Introduction** ................................................................. 4

   **II.**    **Statement of Relevant Facts and History** .............................. 5

        A.   Ferrari suffered a serious on-the-job neck injury that impaired his ability to work from 2001 to 2012 ................................................ 6

        B.   After numerous doctors cleared Ferrari to work with no medical or work restrictions, Ford's company doctor unilaterally imposed her own work restrictions. .............................................. 7

        C.   Ford hides medical information from Ferrari and refuses to conduct an individualized inquiry. .......................................... 12

        D.   Ferrari could perform the apprenticeship position even with the company doctor's unilaterally-imposed restrictions. .......................... 18

**SUMMARY OF ARGUMENT** ................................................................. 21

**ARGUMENT** ................................................................. 23

   **I.**    **Standard of Review** ................................................................. 23

   **II.**    **The trial court improperly granted summary judgment on Ferrari's disability claims** ................................................................. 24

        A.   The *McDonnell Douglas* burden-shifting and the *prima facie* case.... 26

B.   The trial court correctly held that Ferrari is an individual with a disability, but incorrectly held that, as a matter of law, Ford did not regard him as disabled. ........................................................27

C.   The trial court incorrectly held that Ferrari could not demonstrate a question of fact that he was a "qualified individual". .........................30

1.   The trial court impermissibly imported Ford's proffered non-discriminatory reason into the *prima facie* case. When Ferrari's actual disability is considered, he can meet his "not onerous" burden. .......32

2.   Even if Ferrari's alleged prescription medication use is evaluated at the *prima facie* case stage, Ferrari can demonstrate a question of fact that he was a "qualified individual". ..........................................................34

a.   There is a question of fact that Ferrari could perform the essential RMI functions................................................................................34

b.   There is a question of fact that Ferrari could be reasonably accommodated. ..............................................................................42

D.   Ford's proffered non-discriminatory reason for restricting Ferrari and denying him the RMI apprenticeship is his alleged opioid use. ........46

E.   The trial court erred in analyzing causation without considering evidence of pretext. ..........................................................................46

III.   **The trial court improperly granted summary judgment on Ferrari's FMLA claim** ..............................................................................54

**CONCLUSION** .................................................................................55

# TABLE OF AUTHORITIES

### Cases

*Asmo v. Keane, Inc.*, 471 F.3d 588 (6th Cir. 2006) ....................................51

*Blackwell v. Sun Elec. Corp.,* 696 F.2d 1176 (6th Cir. 1983) ...............................27

*Burrage v. United States*, 134 S.Ct. 881 (2014) .......................................24

*Carter v. Univ. of Toledo*, 349 F.3d 269 (6th Cir. 2003).........................................53

*Chen v. Dow Chem. Co*., 580 F.3d 394 (6th Cir. 2009)............................................49

*Chichewivz v. UNOVA Indus. Auto. Sys., Inc.,* 92 Fed. Appx. 215, 220 (6th Cir. 2004) ......................................................................................................51

*Cicero v. Borg–Warner Auto., Inc.,* 280 F.3d 579 (6th Cir. 2002)...........................51

*Cline v. Catholic Diocese of Toledo*, 206 F.3d 651 (6th Cir. 2000) .................. 33, 34

*Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807 (6th Cir. 2007) ......................................................................................................29

*Dubey v. Stroh Brewery Co.*, 185 Mich. App. 561 (1990) ......................................49

*Duchon v. Cajon Co*., 791 F.2d 43 (6th Cir. 1986) ........................................51

*Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344 (6th Cir. 1998)............52

*Farhat v. Jopke*, 370 F.3d 580 (6th Cir. 2004) .......................................23

*Garg v. Macomb County Cmty. Mental Health Servs.*, 472 Mich. 263 (2005).......29

*Goostree v. State of Tennessee*, 796 F.2d 854 (6th Cir. 1986) ................................25

*Gross v. FBL Fin. Servs., Inc*., 557 U.S. 167 (2009)................................................24

*Hall v. U.S. Postal Svc.*, 857 F.2d 1073 (6th Cir., 1988)..........................................31

*Hamilton v. Gen. Elec. Co.*, 556 F.3d 428 (6th Cir. 2009) ......................................50

*Henschel v. Clare County Rd. Comm'n*, 737 F.3d 1017 (6th Cir. Mich. 2013) .......46

*Holiday v. City of Chattanooga*, 206 F.3d 637 (6th Cir. 2000).................. 35, 38, 39

*Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427 (6th Cir. 2002) ..........................49

*Jones v. Nissan N. Am., Inc.*, 438 Fed. Appx. 388 (6th Cir. 2011)..........................38

*Kiphart v. Saturn Corp.*, 251 F.3d 573 (6th Cir. 2001) ............................... 28, 31, 45

*Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862 (6th Cir. 2007)....................................43

*Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078 (6th Cir. 1994).........48

*Matras v. Amoco Oil Co.*, 424 Mich. 675 (1986) ....................................................24

*Merkel v. Scovill, Inc.*, 787 F.2d 174 (6th Cir., 1986), *cert. denied,* 479 U.S. 990 (1986) ....................................................................................................................27

*Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173 (6th Cir. 1996) ....................28

*Mosholder v. Barnhardt*, 679 F.3d 443 (6th Cir. 2012)............................................23

*MX Group, Inc. v. City of Covington*, 293 F.3d 326 (6th Cir. 2002)........................29

*Reeves v. Sanderson Plumbing Products, Inc.*, 520 U.S. 133 (2000).....................49

*Rodriguez v. ConAgra Grocery Products Co.*, 436 F.3d 468 (5th Cir. 2006)..........38

*Rosebrough v. Buckeye Valley High Sch.*, 690 F.3d 427 (6th Cir. 2012)................45

*School Bd. of Nassau County v. Arline*, 107 S. Ct. 1123 (1987) ............................31

*Keith v. County of Oakland*, 703 F.3d 918 (6th Cir. 2013) ............................... 35, 46

*Stevens v. Inland Waters, Inc.*, 220 Mich. App. 212 (1997)....................................24

*Sutherland v. Michigan Dep't of Treasury*, 344 F.3d 603 (6th Cir. 2003)..............49

*Texas Dep't of Cmty Affairs v Burdine*, 450 US 248 (1981)...................... 26, 27, 48

*Thurman v. Yellow Freight Sys.,* 90 F.3d 1160 (6th Cir., 1996) ............................51

*U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711 (1983) ..................26

*United States v. Miller*, 767 F.3d 585 (6th Cir. 2014) .............................................24

*Weigel v. Baptist Hosp. of East Tennessee*, 302 F.3d 367 (6th Cir. 2002)..............25

*Zambetti v. Cuyahoga Community College*, 314 F.3d 249 (6th Cir. 2002)..............48

**Statutes**

42 U.S. C. § 12102(3)(B .....................................................................29

42 U.S.C. § 12112(a) .........................................................................24

42 U.S.C.A. 12111(8) .........................................................................31

M.C.L.A. § 37.1102 ...........................................................................24

M.C.L.A. § 37.1103 ...........................................................................29

**Rules**

29 C.F.R. 1430.2(k)(3)........................................................................43

Fed. R. Civ. P. 56(c)...........................................................................23

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Plaintiff-Appellant believes that oral argument would assist the Court in factual and legal development of the arguments presented on appeal. The trial court's analysis of the law and facts has significant gaps, both as to the record and the applicable law. Plaintiff-Appellant believes that oral argument would assist the Court in application of applicable case law in this Circuit to the relevant facts.

## JURISDICTIONAL STATEMENT

This is an appeal from the trial court's dismissal of Plaintiff-Appellant's claims, brought pursuant to the Americans with Disabilities Act, Michigan's Persons with Disabilities Civil Rights Act, and the Family and Medical Leave Act, that he was discriminated against on the basis of his disability and retaliated against for taking FMLA leave.

The trial court had jurisdiction of Plaintiff-Appellant's federal claims pursuant to 28 U.S.C.A. § 1331 and Plaintiff-Appellant's state claims pursuant to 28 U.S.C.A. § 1367.

This Court has jurisdiction of this appeal pursuant to 28 U.S.C.A. § 1291 as the trial court's grant of summary judgment and dismissal is a final order appealable as of right. Final judgment was entered on March 27, 2014. (Judgment, RE 46, Page ID # 1329) Plaintiff-Appellant filed his Notice of Appeal on April 23, 2014. (Notice of Appeal, RE 49, Page ID # 1343)

## STATEMENT OF ISSUES

1)    Did the trial court incorrectly hold that, as a matter of law, Plaintiff-Appellant was not a qualified individual under the relevant statutes where Defendant-Appellee imposed blanket work restrictions in the face of admissible countervailing evidence that a) Plaintiff-Appellant was not taking opioids; b) Plaintiff-Appellant was not suffering any impairments as a result of alleged prescription drug use; and c) any alleged effects of prescription drug use could have been reasonably accommodated?

Plaintiff-Appellant says yes.

2)    Did the trial court incorrectly find that, as a matter of law, Plaintiff-Appellant's disability was not a "but for" cause of the adverse employment action where it failed to consider admissible countervailing evidence that Defendant-Appellee's proffered reason for imposing restrictions, and thus denying Plaintiff-Appellant the RMI apprenticeship, were pretextual?

Plaintiff-Appellant says yes.

3)    Did the trial court incorrectly find, as a matter of law, the Defendant-Appellant did not have notice of Plaintiff-Appellee's protected activity, i.e., his medical leaves under the FMLA, where his records documented his FMLA leaves and the plant doctor's notes reflect her understanding that she was evaluating him for return to work from medical leave?

Plaintiff-Appellant says yes.

# STATEMENT OF THE CASE

## I.    Introduction

Defendant-Appellee Ford Motor Company denied Plaintiff-Appellant Gianni Ferrari an apprenticeship in the skilled trades after a half dozen doctors (including Ford's own doctor) found that his disability, i.e., herniated discs in his neck caused by a work-related injury, required no medical restrictions and had no effect on his ability to perform in the apprenticeship. Ford advanced the pretextual assertion that Ferrari's alleged use of prescription medication rendered him unfit to work in the apprenticeship. But Ford's plant doctor merely repurposed prior, medically unnecessary work restrictions, substituting out Ferrari's neck injury and newly asserting his alleged prescription use as justification for them. Ford's plant doctor collaborated with top-level Ford medical staff and plant labor relations to deny Ferrari the skilled trades apprenticeship. They ignored Ferrari's assertion that he was not taking prescription drugs, withheld Ferrari's medical file to prevent him from contacting his doctor with relevant information, and refused objective testing to determine the truth of the alleged prescription drug use.

Then, after denying him the apprenticeship, Ford placed Ferrari back onto the plant floor, in a position which required him to work outside of Ford's imposed work restrictions and required him to perform dangerous, strenuous tasks – despite Ford's alleged safety concerns regarding his alleged prescription drug use.

4

Everyone who ever examined Ferrari agrees: he was medically and physically capable of performing the essential functions of a skilled trades position with or without reasonable accommodation for his disability. Ford's refusal to place Ferrari in the apprenticeship on the pretext of alleged prescription drug use is a violation of the Americans with Disabilities Act, Michigan's Persons with Disabilities Civil Rights Act, and was in retaliation for his use of Family and Medical Leave Act benefits.

## II.    Statement of Relevant Facts and History

Gianni Ferrari began working at Ford Motor Company as an hourly employee in 1996 and remains employed there today. (Ferrari Deposition, RE 36-2, Page ID # 916-934, pp. 72-73) Throughout his employment, he has been a member of United Auto Workers Local 228 and has worked at Ford's Sterling Plant. *Id.* at pp. 73, 75. The Collective Bargaining Agreement includes a process by which production employees, like Ferrari, can become apprentices in the Skilled Trades. (UAW-Ford CBA Skilled Trades Agreement, RE 36-3, Page ID # 935-938, pp. 15-16) Ferrari completed the preliminary testing process in 1999 and selected three skilled trades in which he would be on a list for future openings. *Id.* at 15. Employees are "called" to the trades based on the length of time that they have been on the list. While Ferrari worked at the Sterling Plant, he was eligible for positions at either the Sterling or Van Dyke plant. (Ferrari Deposition, RE 36-2, Page ID 916-934, p. 47)

5

A. <u>Ferrari suffered a serious on-the-job neck injury that impaired his ability to work from 2001 to 2012.</u>

In 2000, Ferrari suffered a serious injury to his neck while doing his job. He suffered three herniated discs in his neck and also received a diagnosis of spinal spondylosis. (Ferrari Deposition, RE 36-2, Page ID # 916-934, p. 104) Ferrari was unable to work between June 1, 2001 and April 21, 2003 and subsequently worked with a series of restrictions that often kept him out of production work. (*Id*. pp. 82-85, 93-94; Employee Records, RE 36-4, Page ID # 939-941; Medical Leaves, RE 36-5, Page ID # 942-943) Ferrari also applied for and received leave under the Family and Medical Leave Act on several occasions, including in 2008, October of 2011, and January of 2012, for his neck condition. (Ferrari Deposition, RE 36-2, Page ID # 916-934, pp. 303-05)

In 2012, Ferrari was working in the human resources department. (*Id*. p. 104) However, due to what Ferrari believed was unfair treatment by his supervisor, he developed serious mental health issues and went on an approved FMLA leave in June of 2012. (*Id*. pp. 304-05) In November/December, 2012, an independent medical examiner was ready to find that Ferrari had sufficiently recovered from his mental health problems to return to work. (*Id*. pp. 184-85) Around the same time, Ferrari was told that Ford, for the first time in years, was calling people to the trades and that he would be up for a position. (*Id*. p. 185) Ferrari consulted with his doctors about whether his physical restrictions could safely be lifted.

6

B.    <u>After numerous doctors cleared Ferrari to work with no medical or work restrictions, Ford's company doctor unilaterally imposed her own work restrictions</u>.

Prior to returning from the June, 2012 FMLA, Ferrari had to be medically cleared by Ford's doctor, Dr. Athelia Brewer, to return to work.[1] Ferrari met with Dr. Brewer on December 3, 2012 and shared notes from his treating physicians that restrictions were no longer required, and that "all restrictions from work" had been removed. (Plaintiff's Exhibit E, medical notes under seal) Ferrari told Dr. Brewer that he wanted his restrictions lifted, in part, because of the apprenticeship. *Id*. At the completion of their meeting, Dr. Brewer ordered additional medical testing, including an MRI, and maintained Ferarri's "existing restrictions". (Return to Work, RE 36-6, Page ID # 944-945) Dr. Brewer <u>also</u> signed two separate documents returning Ferrari to work "without restrictions", (Return to Work, RE 36-7, Page ID # 946-947), and reinstating him "from medical leave" with "no restriction". (Return to Work, RE 36-8, Page ID # 948-949) Ferrari returned to work on December 4. (Plaintiff's Exhibit N, Medical Records under seal)

But, then, on December 6, 2012, Dr. Brewer unilaterally imposed her own restrictions based on Ferrari's disability. (Plaintiff's Exhibit I, medical records under

---

[1] Dr. Brewer is the plant doctor at the Van Dyke plant, but the Sterling plant doctor, who had a long relationship with Ferrari, was off on a leave during the events that give rise to this lawsuit.

7

seal, p. 310) Three restrictions were consistent with prior temporary restrictions Ferrari's doctors had provided: 1) "avoid prolonged or sustained deep bending/twisting of neck"; 2) "avoid hard pushing, pulling and lifting over >10 lbs"; and 3) "no overhead work". (*Id.*) In particular, the last restriction was consistent with a prior temporary restriction of "[n]o work at or above shoulder level". (*Id.* p. 309) But Dr. Brewer's restrictions also had significant differences. She imposed a "no climbing ladders" restriction, which Ferrari had never had before. (*Id.*) She also made her restrictions "permanent" unless there was a surgical intervention. (*Id.*; Plaintiff's Exhibit J, medical clearances under seal. p. 24) Up to then, Ferrari had only had temporary restrictions. (Plaintiff's Exhibit I, medical records under seal, pp. 2-3) In fact, Ford had told Ferrari that there could not be permanent restrictions. (Ferrari Deposition, RE 36-2, Page ID 916-934, pp. 195-96)

Importantly, Dr. Brewer based all four restrictions on Ferrari's physical condition and disability. The ladder and overhead work restrictions were coded as resulting from a diagnosis of "Bilateral/Neck/Other cervical disc degeneration". The other two were due to "Right/Shoulder/Brachial plexus disorders-thoracic outlet syndrome." (Plaintiff's Exhibit M, Restriction Report under seal) However, Dr. William Kole, Ferrari's pain management doctor upon whom Ford had previously relied, had "[r]emove[d] all restrictions from work" as of November 21, 2012. (Plaintiff's Exhibit J, medical clearances under seal)

8

On or around December 17, 2012, Ferrari was "called" to the trades. It is undisputed that the RMI tradesman position was his so long as he passed a physical. Dr. Brewer conducted a physical on January 16, 2013. In advance of that physical, Ferrari had sought and obtained additional clearances. So, at the time of the physical he had clearances to work without restrictions from:

- Dr. William Kole, Ferrari's pain management doctor, November 21, 2012 "[r]emove all restrictions from work" (Plaintiff's Exhibit J, medical clearances under seal);

- Dr. David Calton, Ferrari's family doctor, January 7, 2013, "He seems capable of working in refrigeration and skilled trades to me. I will clear him from my perspective with no restrictions" (Plaintiff's Exhibit J, medical clearances under seal) (emphasis added);

- David Brown, functional capacity evaluator, January 11, 2013, noted no barriers to Ferrari returning to work (Plaintiff's Exhibit K, FCE report under seal);

- Dr. Michael Louwers, neurosurgeon, January 15, 2013, "there is no objective evidence to support any restrictions in this patient. While he does have cervical disc bulging, this in no way restricts him from reasonable activity, which would include, but not be limited to skilled trades" (Plaintiff's Exhibit J, medical clearances under seal) (emphasis added);

Thus, Dr. Brewer had medical clearances from four separate persons authorizing Ferrari to work in the skilled trades without restrictions. (Plaintiff's Exhibit N, medical records under seal) Nonetheless, she refused to clear him for the skilled trades position. She instead asked for a "job description" for the RMI position. (*Id*.)

She spoke to the RMI supervisor, Tom Ternan, and asked him to provide "specific examples of ladders and high belt work, like overhead work", i.e., work "[p]erformed above shoulders". (Ternan Deposition, RE 36-9, Page ID # 950-956, p. 51) Ternan took pictures of ladders and also of various valves that would have to be opened and closed that were above a person's head. (*Id*. pp. 51-52) At this point, there is no suggestion anywhere that Dr. Brewer's "no overhead work" meant anything other than the prior (now removed) restrictions of "[n]o work at or above shoulder level", something that could be difficult for someone with a neck or shoulder injury, such as Ferrari. (Plaintiff's Exhibit I, medical records under seal)

On January 31, 2013, a fifth doctor, Dr. Vittorio Morreale, neurosurgeon, also concluded that Ferrari "is able to return to work without restrictions" (Plaintiff's Exhibit J, medical clearances under seal) The medical evidence was in consensus. Five medical personnel, including a functional capacity evaluator and two doctors Ferrari had no prior relationship with, concluded that Ferrari's prior medical restrictions were no longer necessary and that he could enter the skilled trades apprenticeship without work restrictions. Dr. Brewer knew that the medical evidence was in consensus. Yet she still did not release Ferrari for the RMI apprenticeship. (Plaintiff's Exhibit N, Medical Records under seal) Instead, she chose to send Ferrari

10

to another medical exam, with Dr. Phillip Friedman. (*Id.*) Dr. Friedman's exam was performed on January 29, 2013.[2] (*Id.*)

While awaiting the results of Dr. Friedman's exam, Dr. Brewer began reaching for a different reason to deny Ferrari the apprenticeship: his alleged prescription drug use. Ferrari had told Ford that he was not then using opioids. He had started weaning himself off of opioids as of December 2012 and had stopped taking them by the time of the January 2013 physical. (Ferrari Deposition, RE 36-2, Page ID 916-934, p. 187) Dr. Kole's records show that the last prescription for opioids was filled on December 19, 2012. Those records also show that Ferrari returned that set of pills, unopened. [3] (Kole Deposition, RE 36-11, Page ID # 962-964, p. 41) And Ferrari offered to take a drug test to prove he was off of any opioids. But Dr. Brewer never ordered the test. (Ferrari Deposition, RE 36-2, Page ID 916-934, p. 243) Instead, Ford asked Dr. Friedman, a neurosurgeon, to opine on whether Ferrari was "addicted" to prescription pain medications, even though, as Dr. William Heckman, Ford's Executive physician, testified, Dr. Friedman would not know that

---

[2] Defendant-Appellee argued below that this was a required "tiebreaker" and mandated by the CBA. However**,** Defendant-Appellee did not cite to any CBA provision that mandated an IME in this type of situation.

[3] There is confusion because Dr. Calton, Ferrari's family physician, has records that Ferrari had an active prescription as of January 7, 2013. However, Dr. Calton was not the person prescribing opioids, and that notation still appears on his medical records as of the end of 2013, well after all parties would acknowledge Ferrari stopped taking opioids. (Plaintiff's Exhibit U, medical records under seal)

11

based on an IME. (Plaintiff's Exhibit L, Friedman report, under seal; Heckman Deposition, RE 36-16, Page ID # 978-986, p. 19)

    C.    <u>Ford hides medical information from Ferrari and refuses to conduct an individualized inquiry.</u>

On February 7, 2013, Dr. Brewer consulted with her supervisor, Dr. Heckman. She acknowledged that the medical evidence was in consensus and that Dr. Friedman's report (which she had not yet received, *infra*) "will also likely conclude the employee needs no restrictions". (Emails, RE 36-13, Page ID # 968-970) She expressed concern about worker's compensation liability, telling Dr. Heckman that Ferrari was currently working in a clerical position, that workers' compensation "was "concerned with a new date of injury if restrictions are lifted. [Ferrari] will most likely remain in the same position with or without restrictions" (*Id*.) And she asked if she could request an IME from an addiction specialist or psychiatrist to address "cognitive and physical functioning associated with these meds". (*Id*.)

That same day, Dr. Brewer requested information from Dr. Kole requesting his opinion on whether opioids would affect Ferrari's performance. (Kole Letter, RE 36-15, Page ID # 976-977) Dr. Kole replied on February 26, 2013, that Ferrari was <u>not</u> addicted to narcotics, that he had <u>not</u> developed a tolerance to the narcotics, that they do <u>not</u> affect his mental clarity and cognitive functioning, that they do <u>not</u> have an impact on his physical performance, and, most importantly, that he has <u>not</u> demonstrated any side effects, that detoxification is <u>not</u> required, that he <u>is</u> "safely

able to perform all functions listed in the RMI job description." (*Id*.; Plaintiff's Exhibit I, medical records under seal)

Dr. Brewer received Dr. Friedman's report on February 20, 2013. (Plaintiff's Exhibit I, medical records under seal; Emails, RE 36-17, Page ID # 987-992) Dr. Friedman's exam was medically consistent with the <u>five</u> prior exams returning Ferrari to work without restrictions. Dr. Friedman was the <u>sixth</u> medical evaluator to conclude that "[o]n a physical basis, I do not see the need for restrictions" (Plaintiff's Exhibit L, Friedman report, under seal, p. 1387) In a further blow to the restrictions placed by Dr. Brewer, Dr. Friedman concluded that Ferrari's condition was not surgical and he was "unable to confirm any surgical correctible problem". *Id*. He also partially addressed Ford's questions about addiction, *infra*.

On February 25, Ford management employee Linda Beggs emailed Dr. Brewer seeking clarification regarding Dr. Brewer's restrictions for Ferrari. (Emails, RE 36-12, Page ID # 965-967) Dr. Brewer replied by listing her four restrictions and <u>newly</u> linking them to alleged prescription drug use. In so doing, she relied solely on Dr. Friedman's January 29th report. (*Id*.)

In his report, Dr. Friedman acknowledged that Ferrari "indicated…that he has been off of opiates for the past three months". (Plaintiff's Exhibit L, Friedman report, under seal, p. 1386) Dr. Friedman followed up by saying that "[**i**]**f** he currently remained on opioids, I would not allow him to resume unrestricted employment."

13

*Id.*, p. 1387 (emphasis added). Dr. Friedman admitted that he was "uncertain whether [Ferrari] is continued on medication," but speculated that the prescription pain medications "may affect his performance". *Id.*, p. 1387. Dr. Friedman does not identify any restrictions. Nor does he identify any effects on Ferrari's "cognitive and physical functioning" or physical endurance or any side effects of the medications – the rationale Dr. Brewer provided to Dr. Heckman. (Emails, RE 36-13, Page ID # 968-970) Simply put, Dr. Friedman's report provided zero factual or objective basis for imposing restrictions. Nor was Ford bound by Dr. Friedman's ambiguous statements. Dr. Heckman, testified that, in determining whether to apply restrictions, Dr. Brewer should have considered <u>all</u> of the medical records, the safety of the employee, and the safety of the plant. (Heckman Deposition, RE 36-10, Page ID # 957-961, pp. 8, 26, 39)

As the process dragged on, Ferrari remained in limbo. He requested his medical file several times, confused as to why he would not have been cleared. (Emails, RE 36-17, Page ID # 987-992) Ford deliberately refused to provide Ferrari his medical records to prevent him from getting the bogus restrictions lifted. Ford purportedly has an internal policy of providing medical files to employees within 15 days. On February 26, Dr. Brewer told Ford management employee Linda Beggs that the file that was "copied and . . .ready to be sent" prior to the 15 days. (*Id.*) According to Dr. Heckman, if the documents were copied and ready to be sent there

14

was "no reason" to delay sending them. (Heckman Deposition, RE 36-16, Page ID # 978-986, pp. 40-41) But Dr. Brewer told Beggs that she was going to "wait until closer to the 15 day period" to give Ferrari his file "as she expects he will immediately ask his personal physician to take him off the prescriptions medications so he won't have any current restrictions." (Emails, RE 36-17, Page ID # 987-992) The next day, Brewer placed restrictions on. Ferrari.

On February 27, 2013, Dr. Brewer made a final decision as to what restrictions to impose. She had unilaterally imposed four restrictions back on December 6, 2012. Stuck with those four restrictions, she apparently had to make a claim that some of those restrictions were related to Ferrari's alleged opioid use even though, as referenced above, all were originally listed as stemming from his neck and shoulder injuries. (Plaintiff's Exhibit M, Restriction Report under seal) Therefore, while she removed the bending and lifting restrictions, she reiterated "no overhead work' and "no climbing ladders." (Restriction Reports, RE 36-19, Page ID # 995-998, p. 1387) However, she newly designated the "no overhead work," as no "working at heights". (Plaintiff's Exhibit I, medical records under seal, p. 515) In her deposition, Dr. Brewer justified the restrictions based on alleged "side effects":

A.    The drowsiness, the lethargy. It's a myriad of things that all present concern, especially someone who's having to climb overhead, as he would have to do in the RMI apprenticeship.

Q.    Because they might fall? Is that the concern?

15

> A. Yes, because there are sometimes balance issues or problems with equilibrium.

(Brewer Deposition, RE 36-31, Page ID # 1093-1099, p. 44) But the uncontroverted record evidence is that Ferrari did _not_ suffer from these conditions, as Dr. Kole told Dr. Brewer in February. (Kole Letter, RE 36-15, Page ID # 976-977)

Ford unilaterally imposed restrictions relying on Dr. Friedman's ambiguous statement regarding "unrestricted work." But Dr. Friedman's report provides zero evidence to support Dr. Brewer's alleged concerns. (Plaintiff's Exhibit L, Friedman report, under seal) And Dr. Heckman acknowledged that whether an opioid user could safely climb ladders or work at heights had to be evaluated on a "case-by-case basis." (Heckman Deposition, RE 36-16, Page ID # 978-986, pp. 23, 45) Dr. Brewer, however, took an absolutist position about opioids. She testified that "I'm not comfortable with somebody taking morphine and working in a plant, period." (Brewer Deposition, RE 36-31, Page ID # 1093-1099, p. 44) Dr. Brewer admitted that Dr. Friedman never indicated in any way what restrictions he might place on Ferrari. (Brewer Deposition, RE 36-31, Page ID # 1093-1099, p. 78) Other than Dr. Brewer, not a single other medical professional has ever suggested that Ferrari could not climb ladders or work at heights – restrictions which kept Ferrrari out of the skilled trades apprenticeship, but were not applied to other dangerous and physically strenuous production work on the plant floor, _infra_.

The company doctor did not work independently in setting these restrictions. At first in her deposition, she denied that she had spoken with Beggs in labor relations about Ferrari. (*Id.*, pp. 46-47) However, the documents demonstrate labor relations was heavily involved in what should have been a medical decision. Shortly before the final restrictions were sent, on February 25, 2013, Beggs sent an email to the company referencing conversations with her and providing her information about Ferrari that Dr. Brewer acknowledged were irrelevant to her inquiry. (Emails, RE 36-14, Page ID # 971-975; Brewer Deposition, RE 36-31, Page ID # 1093-1099, p. 100) Beggs spoke with Dr. Brewer again the next morning about her aforementioned refusal to provide medical records. (Emails, RE 36-17, Page ID # 987-992) Beggs was invited to be on a phone call with Dr. Brewer and Dr. Heckman the next day, even though Dr. Brewer admitted there is no reason for a labor rep to be on a phone call between her and Dr. Heckman. (*Id.*; Brewer Deposition, RE 36-31, Page ID # 1093-1099, pp. 106-07)[4]

The company doctor recorded these restrictions and passed them to Beggs. Dr. Brewer did not state a duration for the restrictions, even though she claimed that the restrictions were only for the alleged weaning process – a process Dr. Kole

---

[4] It also appears that the company doctor consulted with worker's compensation representatives because she sent a worker's compensation representative an email stating she needed to speak with her about Ferrari. (Emails, RE 36-18, Page ID # 993-994)

estimated would only take several months. (Brewer Deposition, RE 36-31, Page ID # 1093-1099, p. 47; Restriction Reports, RE 36-19, Page ID # 995-998; Kole Letter, RE 36-15, Page ID # 976-977) The sheet was quickly passed to Ferrari's the RMI supervisor Ternan, and two higher-level supervisors who signed off that they could not accommodate the restrictions imposed by Dr. Brewer. (Restriction Reports, RE 36-19, Page ID # 995-998) As a result, Ferrari was denied the skilled trades position on February 28, 2013. (Emails, RE 36-22, Page ID # 1006-1009)

D.    <u>Ferrari could perform the apprenticeship position even with the company doctor's unilaterally-imposed restrictions.</u>

The RMI tradesman position, for an actual tradesman, might require that the employee be able to climb ladders. However, Ferrari was simply attempting to become an apprentice, a position that would last for three years, well beyond the length of time Dr. Brewer believed it would take to wean him from prescription medication. (Beggs Deposition, RE 36-20, Page ID # 999-1001, p. 33; Kole Letter, RE 36-15, Page ID # 976-977) As an apprentice, Ferrari is forbidden from ever working without a tradesman. (Ternan Deposition, RE 36-9, Page ID # 950-956, pp. 46-49) To become a journeyman, Ferrari has to show mastery of a number of tasks. Some of those include climbing ladders or working at heights, and many do not. (*Id*., pp. 70-71). Ternan openly acknowledged that he could accommodate a person with a ladder restriction for a week. (*Id*., p. 69) At his deposition, Ternan did not deny

that there were sufficient tasks that are not on ladders or at heights for Ferrari to perform for six months. (*Id.*, p. 71)

However, no interactive process occurred where the restrictions were discussed with Ferrari, who in April still did not know why the restrictions were placed. (Emails, RE 36-20, Page ID # 1002-1005) No potential accommodations were discussed except for blanket, indefinite restrictions imposed by the company doctor.

The company doctor's restrictions, which were carefully crafted to keep Ferrari out of the trades, left him free to perform almost any job in production. In fact, Ford immediately placed Ferrari in one of the most physically demanding positions in the plant, a position working with axle shafts that could weigh in excess of 50 pounds and which included actual "overhead work." (Ferrari Deposition, RE 36-2, Page ID 916-934, pp. 88-90) This position was not even in Ferrari's job classification. (*Id.*, p. 117; Interrogatory Answers, RE 36-23, Page ID # 1010-1013) Moreover, such placement was contrary to Dr. Brewer's restriction of "no overhead work" and Dr. Brewer's assertion that "I'm not comfortable with somebody taking morphine and working in a plant, period." (Brewer Deposition, RE 36-31, Page ID # 1093-1099, p. 44) After a month, Ferrari was able to move out of this position and into a different production position, where he remains.

19

## SUMMARY OF ARGUMENT

The trial court held correctly that Ferrari met the definition of disabled because of his neck injury, i.e., what the trial court calls his neck-based disability. The trial court incorrectly held that Ferrari was not "regarded as" disabled because of his alleged prescription medication use. The trial court explicitly held that Ferrari's alleged prescription medication use is neither a disability nor a perceived disability. Having correctly identified Ferrari's neck-based disability, the court then disregarded its own holdings and, without explanation or analysis, substituted Ferrari's alleged opiate use to analyze the remainder of his *prima facie* case, i.e., finding that his alleged opiate use a) rendered him unqualified and b) could not be reasonably accommodated. One is justified in asking: what happened to Ferrari's actual disability, his neck injury, which undisputedly had no effect on his ability to do the job and did not need to be accommodated?

To compound its error, when analyzing the third prong of its chosen *prima facie* case, causation, the trial court implicitly treated the alleged opiate use as Ford's proffered legitimate non-discriminatory reason – but did not apply the pretext analysis. As Ferrari argued below, the trial court should have applied the burden-shifting analysis in considering whether Ford's proffered reason for its actions, Ferrari's alleged opioid use, was pretext for disability discrimination. It did not. It merely held that because Ford said opiate use was the reason, that was sufficient to

compel summary judgment. The trial court could only reach that conclusion by disregarding evidence demonstrating a question of fact that something else may have motivated Defendant, such as Ferrari's record of a neck-based disability. Such evidence includes Dr. Brewer's shifting justifications for her restrictions; that Ferrari was not taking opiates; that Ferrari volunteered for a drug test that Dr. Brewer would not order; that Dr. Brewer withheld Ferrari's medical records; that even if Ferrari was taking opiates he was not suffering the deleterious effects feared by Dr. Brewer; and that despite the alleged opiate use Ford assigned Ferrari to a more strenuous production job on the plant floor.

The trial court also incorrectly held that there was no question of fact that Defendant-Appellee's employees, including Dr. Brewer, did not have notice of Ferrari's protected FMLA activity, i.e., his use of FMLA medical leaves.  Dr. Brewer's own notes reflect her awareness that Ferrari was returning from "medical leave" and Ferrari's use of FMLA was documented in his personnel file.

# ARGUMENT

## I.    Standard of Review

The standard of review on appeal from a grant of summary judgment is *de novo*. *Farhat v. Jopke*, 370 F.3d 580, 587 (6th Cir. 2004). "Summary judgment is appropriate where 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact' as to an essential element of the non-moving party's claim." *Id*. *quoting* Fed. R. Civ. P. 56(c). When reviewing a grant of summary judgment, the Court views "all facts and inferences drawn from those facts in the light most favorable to the nonmoving party." *Mosholder v. Barnhardt*, 679 F.3d 443, 449 (6th Cir. 2012). And "[w]here there are no disputed, material facts, we determine, *de novo*, whether the district court properly applied the substantive law." *Farhat*, *supra* at 588.

## II.   The trial court improperly granted summary judgment on Ferrari's disability claims

The Americans with Disabilities Act (ADA) and Michigan's Persons with Disabilities Civil Rights Act (PWDCRA) prohibit discrimination against qualified individuals because of their disability.[5] 42 U.S.C. § 12112(a); M.C.L.A. § 37.1102. "Because of" causation is not "sole cause", rather it is "but for" causation and plaintiff's disability need not be the sole cause of the adverse employment action. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009); *Burrage v. United States*, 134 S.Ct. 881, 888-89 (2014) (a factor can be a but for cause even if it "combines with other factors to produce the result, so long as the other factors alone would not have done so—if, so to speak, it was the straw that broke the camel's back"); *United States v. Miller*, 767 F.3d 585, 592 (6th Cir. 2014) ("but for" causation requires only that "[t]he prohibited act or motive must *be* <u>an</u> actual *cause of* the specified outcome") (underline added); *Matras v. Amoco Oil Co.*, 424 Mich. 675, 682 (1986), (a "jury can find that the discharge was 'because of age' even if age was not the sole factor").

Plaintiff may establish a claim of discrimination through ordinary principles of proof, <u>i.e.</u> through direct evidence of discriminatory animus, <u>or alternatively</u>, if direct evidence is unavailable, through circumstantial evidence.

---

[5] Because of similarity in purpose, definitions, and analysis it is appropriate to look to the ADA for guidance in interpreting the PWDCRA. *Stevens v. Inland Waters, Inc.*, 220 Mich. App. 212, 217 (1997).

24

> Direct evidence of discrimination is "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred.

*Wexler v. White's Fine Furniture*, 317 F.3d 564, 570 (6th Cir. 2003) (citations omitted).

Where plaintiff relies on circumstantial evidence, he proceeds through the burden-shifting approach in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Wilcoxon v. Minnesota Mining and Manuf. Co.*, 235 Mich. App. 347, 359 (1999). Where plaintiff has direct evidence, he need not proceed through the burden shifting analysis. *Weigel v. Baptist Hosp. of East Tennessee*, 302 F.3d 367, 381-382 (6th Cir. 2002); *Wilcoxon*, *supra*, at 360.

If plaintiff presents circumstantial evidence, the *McDonnell Douglas* burden-shifting approach <u>itself incorporates a showing of causation</u>: a showing of pretext is also a showing of "but for" causation. *Goostree v. State of Tennessee*, 796 F.2d 854, 864 (6th Cir. 1986). Causation is satisfied by a showing that discrimination "more likely than not was the basis of the adverse employment action." *Id.* at 864.

As the trial court acknowledged, Plaintiff-Appellant Ferrari argued <u>both</u> direct and indirect evidence. (Opinion, RE 45, Page ID # 1299-1328, p. 10 n2) Yet, the trial court did not consider or apply the indirect method of proof and the burden

shifting requirements of *McDonnell Douglas* and its progeny. Correction of this error requires reversal of the District Court.

A.    The *McDonnell Douglas* burden-shifting and the *prima facie* case.

The *McDonnell Douglas* burden-shifting incorporates three stages. First, plaintiff must demonstrate a *prima facie* case. If plaintiff meets this burden, defendant is required to articulate a legitimate non-discriminatory reason for the adverse action. Once defendant meets this burden, it is plaintiff's burden to demonstrate that the proffered reason is pretextual. *McDonnell Douglas Corp.*, *supra*.

The *prima facie* case is a flexible standard that is not limited to a single iteration. The U.S. Supreme Court has repeatedly held that the facts will necessarily vary in discrimination cases and the *prima facie* case should be flexible and responsive to fit different factual situations. *Texas Dep't of Cmty Affairs v Burdine*, 450 US 248, 253 n6 (1981); *McDonnell Douglas,* 411 U.S. at 802, n13. In *U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983), the Court reaffirmed that the *prima facie* case was "never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination". The Sixth Circuit has also consistently held that *McDonnell Douglas* is not to be applied mechanically, requiring a case-by-case approach that focuses on whether the

protected characteristic was a determining factor in the employment decision. *Merkel v. Scovill, Inc.,* 787 F.2d 174, 177 (6th Cir. 1986), *cert. denied,* 479 U.S. 990 (1986) ("We rejected long ago attempts to mechanically apply to ADEA proceedings the evidentiary standards enumerated in *McDonnell Douglas* and indicated that such actions are to be reviewed on a 'case by case basis.'") (citations omitted); *Blackwell v. Sun Elec. Corp.,* 696 F.2d 1176, 1179 (6th Cir. 1983) (holding that a plaintiff who could not demonstrate every element of the *McDonnell Douglas* test could nonetheless demonstrate a *prima facie* case). Moreover, it is well established the plaintiff's burden under the *prima facie* case is "not onerous". *Burdine*, 450 U.S. at 253.

In considering the *prima facie* case, the trial court considered a number of opinions of this Court, published and unpublished. But in <u>applying</u> the *prima facie* case, the trial court did not consider application of the *McDonnell Douglas* burden shifting framework, and only considered the presentation of evidence in a rigid "direct evidence" formulation. But this Court need not address the question of which *prima facie* should be used. Whatever *prima facie* case is used, the trial court committed reversible error by importing Ford's proffered legitimate reason into the *prima facie* case and failing to consider evidence of pretext in its causation analysis.

B.    <u>The trial court correctly held that Ferrari is an individual with a disability, but incorrectly held that, as a matter of law, Ford did not regard him as disabled.</u>

27

A "person is 'disabled' within the meaning of the ADA and the PWDCRA if he (1) has some impairment substantially limiting him in one or more major life activities, (2) has a record of such an impairment, or (3) is regarded by his employer as having such an impairment." *Kiphart v. Saturn Corp.*, 251 F.3d 573, 582 (6th Cir. 2001).

The trial correctly held that Ferrari was disabled as defined by the statutes because he has a record of a neck-based disability. (Opinion, RE 45, Page ID # 1299-1328, p. 13) ("Accordingly, plaintiff qualifies as disabled based on the record of his neck-based disability"). *See Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1186-87 (6th Cir. 1996) (first element of *prima facie* case is that plaintiff is disabled). Ford does not dispute this. Nor could Ford dispute this, given Ferrari's medical history of neck injury and Ford's granting of disability accommodations and FMLA leaves for that injury over more than a decade. (Employee Records, RE 36-4, Page ID # 939-941; Medical Leaves, RE 36-5, Page ID # 942-943; Plaintiff-Appellant's Ex. E, medical notes under seal; Plaintiff's Exhibit I, medical records under seal; Plaintiff's Exhibit N, Medical Records under seal; Kole Letter, RE 36-15, Page ID # 976-977)

The trial court erred, however, when it found as a matter of law that Ferrari was not "regarded as" disabled because of his alleged prescription drug use. The "regarded as" prong "cover[s] those who do not presently suffer from a substantially

28

limiting impairment, but are regarded as having such an impairment." *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 340 (6th Cir. 2002). Courts are instructed to "look to the state of mind of the entity against whom [plaintiff] makes a claim." *Id.* State of mind is not generally amenable to summary judgment. *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 823 (6th Cir. 2007) ("claims involving proof of a defendant's intent seldom lend themselves to summary disposition"). Nonetheless, the trial court found that Dr. Brewer believed Ferrari's alleged use was "transitory" because she expected it to last no longer than 3-4 months, under the six month cut-off in 42 U.S. C. § 12102(3)(B). (Opinion, RE 45, Page ID # 1299-1328, pp. 15-16)

Michigan's PWDCRA does not have the "transitory" limitation of the ADA. M.C.L.A. § 37.1103. Where statutes differ, Michigan does not follow federal precedent. *Garg v. Macomb County Cmty. Mental Health Servs.*, 472 Mich. 263, 283 (2005).

Further, the trial court points to no record evidence demonstrating Dr. Brewer's undisputed belief. While Dr. Kole's weaning period is evidence that Ferrari's alleged use could continue 3-4 months <u>longer</u>, it is evidence <u>neither</u> of Dr. Brewer's subjective belief <u>nor</u> the length of time that Ferrari was taking such medications prior. Logically, it makes no sense consider only the time going forward and not the time prior. Moreover, there is record evidence as to Dr. Brewer's

29

subjective belief which contradicts the trial court's fact finding. On February 7, 2013 Dr. Brewer described Ferrari's use of prescriptions as "long-term". (Emails, RE 36-13, Page ID # 968-970, p. 1677) And her notes reflect her understanding that Ferrari could be on medication beyond the weaning. She was to reassess Ferrari in 3-4 months "to monitor the progress of weaning him from these medications. If this process is successful and documented, the remaining restrictions will be removed." (Plaintiff's Exhibit I, medical records under seal, p. 515) (emphasis added) There is no basis for the trial court's holding that, as a matter of uncontested fact and law, Dr. Brewer believed that Ferrari's use of pain medications was limited to 3-4 months. As the trial court does throughout its opinion, it draws inferences in favor of Defendant-Appellee and makes findings of fact based on those inferences. Its fact-finding here was improper and should be reversed.

C.    The trial court incorrectly held that Ferrari could not demonstrate a question of fact that he was a "qualified individual".

A "qualified individual" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C.A. § 12111(8); *Kiphart*, 251 F.3d at 584; *Hall v. U.S. Postal Svc.*, 857 F.2d 1073, 1078 (6th Cir. 1988) (to determine if a plaintiff is qualified, court must consider both plaintiff's ability to perform essential functions and whether a reasonable accommodation would enable plaintiff to perform those functions).

30

The trial court <u>incorrectly</u> held that Ferrari could not demonstrate a question of fact that he was a "qualified individual". In its motion and brief, Ford argued that it is not liable for disability discrimination because Dr. Brewer's work restrictions were not based on any actual or perceived disability, but Ferrari's alleged opioid use:

> "Dr. Brewer restricted Plaintiff from climbing ladders and working at heights based on Dr. Friedman's report…that Plaintiff required restrictions due to opioid usage, not due to an actual or perceived physical mental impairment."

(Defendant's Motion, RE 33, Page ID # 499-879, pp. 13-14) Accordingly, Ford's proffered non-discriminatory reason for its adverse action is Ferrari's alleged drug use. There is no dispute that, but for Ford's imposition of work restrictions for a pretextual reason, Ferrari could do the essential functions of the RMI apprenticeship "in spite of his handicap". *School Bd. of Nassau County v. Arline*, 107 S. Ct. 1123, 1131 (1987), *quoting Southeastern Community College v. Davis*, 442 U.S. 397, 406 (1979). *See also Kiphart,* 251 F.3d at 584 (a qualified individual has a disability "but nonetheless, 'with or without reasonable accommodation, can perform the essential functions of the employment position he holds or desires'") Although Ford asserts that Dr. Brewer's work restrictions render Ferrari unable to perform essential functions, that is a sleight of hand. Ford justifies its imposition of its own work restrictions with an alleged non-discriminatory reason. Whether that reason justifies the imposition of restrictions, is the true reason, or is a pretextual reason, is better analyzed at the pretext stage, *infra*, not the *prima facie* case stage. The trial court's

holding, however, ignored Ferrari's "neck-based disability", and focused on his alleged prescription drug use. (Opinion, RE 45, Page ID # 1299-1328, pp. 14-16, 24) The trial court impermissibly imported Ford's proffered non-discriminatory reason into the *prima facie* case.

1. <u>The trial court impermissibly imported Ford's proffered non-discriminatory reason into the *prima facie* case. When Ferrari's actual disability is considered, he can meet his "not onerous" burden.</u>

This Circuit has repeatedly held that courts may not consider a defendant's alleged nondiscriminatory reason when analyzing plaintiff's *prima facie* case. Doing so "would by-pass the burden-shifting analysis and deprive Plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination." *Wexler*, 317 F.3d at 574. Similarly, *McDonnell Douglas* states that a plaintiff must be given a full and fair opportunity to demonstrate that the presumptively valid reasons for the defendant's employment decision were in fact a cover up for a discriminatory action. *McDonnell Douglas*, 411 U.S. at 805. In *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660-61 (6th Cir. 2000), this Court, while addressing the "legitimate expectations" prong of a *prima facie* case, held that "at the prima facie stage…a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for" the adverse action.

To the extent that the *prima facie* case requires plaintiff to demonstrate he is "otherwise qualified", *see Monette*, 90 F.3d at 1186-87, guidance can be drawn from cases which have considered the qualifications prong of the *prima facie* case. *Wexler*, *supra* at 575, held that courts "should focus on a plaintiff's <u>objective</u> qualifications to determine whether he or she is qualified for the relevant job." (emphasis in original). And plaintiff's *prima facie* burden is met by

> presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field [and] the inquiry should focus on criteria such as education, experience in the relevant industry, and demonstrated possession of the required general skills.

*Id*. at 575-576. Consideration of any plaintiff's qualifications for a position must be considered independently of defendant's proffered legitimate reason. Here, it must be considered independently of Ford's allegations of prescription drug use.

When Ferrari's actual neck-based disability is considered, the record is crystal clear: Ferrari's <u>actual disability</u> has <u>no effect</u> on his ability to be an RMI apprentice and requires <u>no accommodations</u>. Ferrari presented Ford with no less than five medical personnel who said so. (Plaintiff's Exhibit J, medical clearances under seal; Plaintiff's Exhibit K, FCE report under seal) Ford's own IME doctor, Dr. Friedman, a neurosurgeon, said so. (Plaintiff's Exhibit L, Friedman report, under seal) Dr. Brewer, Ford's own plant doctor, repeatedly acknowledged the uniformity of the medical opinion presented to her. (Plaintiff's Exhibit I, medical records under seal;

Plaintiff's Exhibit N, medical records under seal; Emails, RE 36-13, Page ID # 968-970) As the trial court stated: "The record shows that defendant did not consider plaintiff to have any restrictions or limitations related to his neck injury." (Opinion, RE 45, Page ID # 1299-1328, p. 25) Ferrari has no restrictions or limitations and does not need a single accommodation because of his disability.

The trial court's opinion presents a textbook illustration of *Wexler* and *Cline* warned against: by importing Ford's proffered non-discriminatory reason into the *prima facie* case, the trial court bypassed the burden-shifting analysis and deprived Ferrari of the opportunity to demonstrate pretext. The trial court's opinion, demonstrates the wisdom and continuing relevancy of this Court's holdings in *Cline* and *Wexler*, *supra*. Ferrari, absent unjustified and unnecessary work restrictions imposed by Ford for pretextual reasons, is a "qualified individual" with a disability.

Since Ferrari is a person with a disability, and since he can perform the job, a jury could find that Ford violated the ADA, and thus, summary judgment should have been denied. *See Keith v. County of Oakland*, 703 F.3d 918 (6th Cir. 2013) (reversing grant of summary judgment for deaf lifeguard who could show he could communicate sufficiently to be a lifeguard).

    2.    <u>Even if Ferrari's alleged prescription medication use is evaluated at the *prima facie* case stage, Ferrari can demonstrate a question of fact that he was a "qualified individual".</u>

        a.    <u>There is a question of fact that Ferrari could perform the essential RMI functions</u>

Even if Ferrari's alleged opioid use is evaluated within the *prima facie* case, there is a question of fact whether he was a "qualified individual". An employer is required to conduct an individualized inquiry "into the individual's actual medical condition, and the impact, if any, the condition might have on that individual's ability to perform the job in question." *Holiday v. City of Chattanooga*, 206 F.3d 637, 643 (6th Cir. 2000). Both elements are contested issues of fact in this case.

Defendant-Appellee put Ferrari on work restrictions allegedly because of opioid use. It remains a factual dispute whether Ferrari was taking pain medications in January, 2013, when he took the physical for the RMI apprenticeship, or in February, 2013, when Dr. Brewer re-purposed Ferrari's physical work restrictions and prevented entry into the RMI apprenticeship. (Plaintiff's Exhibit I, medical records under seal) Ferrari testified that, in December, 2012, he was weaning himself off of opioids. He informed Dr. Brewer of that fact, but Dr. Brewer did not put that in her notes. (Ferrari Deposition, RE 36-2, Page ID 916-934, p. 187) And at his IME on January, 29, 2013, Ferrari told Dr. Friedman that he was no longer taking pain medications. (Plaintiff's Exhibit L, Friedman report, under seal) Ferrari's medical records show that his last prescription was filled on December 19, 2012. (Kole Deposition, RE 36-11, Page ID # 962-964, p. 41) Ferrari offered to take a drug test, but Dr. Brewer would not order it. (Ferrari Deposition, RE 36-2, Page ID 916-934, p. 243) Defendant-Appellee simply did not ascertain Ferrari's *actual* medical

35

condition, as even Dr. Friedman acknowledged, stating in his report that he was "uncertain whether [Ferrari] is continued on medication", and premising further action on if he was taking opioids. (Plaintiff's Exhibit L, Friedman report, under seal, p. 1387)

Questions of fact exist as to the second element of the "individualized inquiry" as well: whether Ferrari could perform the essential functions of the RMI apprenticeship. As Dr. Heckman noted, different people respond to opioids in a different fashion, and some would be capable of climbing ladders and/or working at heights. (Heckman Deposition, RE 36-16, Page ID # 978-986, pp. 23, 45) As Dr. Calton noted, different people respond differently to opioids and the person with the best knowledge of how a person was responding were the patient and the person prescribing the pain medication. (Calton Deposition, RE 36-301, Page ID # 1090-1092, p. 84) The issue in this case is what impact opioids had on Ferrari as of February 27, 2013. The only specific evidence comes from Dr. Kole, Ferrari's doctor for over a decade, who concluded that there was no impact.

Dr. Kole is a diplomat of, among others, the American Academy of Pain Management.[6] (Calton Deposition Transcript Excerpts, RE 36-301, Page ID # 1090-

---

[6] Defendant-Appellee tried to undermine Dr. Kole by pointing out the obvious – that Dr. Kole does not have a particular expertise in Ferrari's physical ability to perform particular job duties and that he would be reliant on Ferrari to know how narcotics were impairing his job performance. But, in this case, the only Functional Capacity Evaluation found that Ferrari could work in an unrestricted manner, and any inability

1092) Dr. Heckman testified that Dr. Kole's conclusions should be considered in determining whether to impose restrictions. (Heckman Deposition Transcript Excerpts, RE 36-16, Page ID # 978-986, p. 39) Dr. Kole concluded that, based on his knowledge, Ferrari could perform the essential functions of his job without accommodation. (Kole Letter, RE 36-15, Page ID # 976-977; Kole Deposition Transcript Excerpts, RE 36-11, Page ID # 962-964, pp. 46-47) He also specifically addressed Dr. Brewer's concerns about "cognitive and physical functioning associated with these meds". (Emails, RE 36-13, Page ID # 968-970) Dr. Kole's reponse was clear and is uncontroverted by any other evidence: Ferrari was not addicted and did not have a tolerance; the medications did not affect his physical performance, mental clarity, or cognitive functioning; he suffers no side effects; and he is able to safely perform all the RMI job functions. (Kole Letter, RE 36-15, Page ID # 976-977)

The only other evidence is Dr. Friedman's vague and speculative statements in his report. The "law is clear that an employer cannot simply rely on a third-party's assessment that an employee is disabled." *Jones v. Nissan N. Am., Inc*., 438 Fed. Appx. 388, 401 (6th Cir. 2011) (granting judgment as a matter of law for Plaintiff when Defendant purported to rely on worker's compensation decision to impose

---

of Dr. Kole to determine the impact of opioids on his patient of over a decade must be many times as great for Dr. Friedman, who saw Ferrari once, or Dr. Brewer, who saw Ferrari twice

37

restrictions). Dr. Friedman offered no opinion about addiction, no support for his conclusions, merely speculated that "the use of opioids may affect [Ferrari's] performance", and did not specify what restrictions would be recommended. (Plaintiff's Exhibit L; Friedman report, under seal, p. 1387) Speculation is anathema to the individualized, fact based inquires required by the ADA. *Rodriguez v. ConAgra Grocery Products Co.*, 436 F.3d 468, 481 (5th Cir. 2006) ("an employer must focus on whether the particular applicant before it…is *actually* capable of performing the essential functions of the job at issue").

In the trial court, Ford attempted to avoid Dr. Kole's conclusions by relying on a number of highly-distinguishable cases that spring from the Sixth Circuit's decision in *Holiday v. City of Chattanooga*, *supra*.[7] *Holiday*, however, effectively proves Plaintiff-Appellant's case. In *Holiday*, plaintiff had HIV and was denied a position in the police force. The doctor deemed him not physically fit because of his HIV status without investigating whether this particular plaintiff with HIV could perform the essential functions of the job.

> Significantly, there is no evidence that Holiday's HIV had progressed beyond the asymptomatic stage, or that Holiday actually suffered from any AIDS-related health problems at the time of his physical examination . . . The doctor's complete failure to investigate the physical effects, if any, of Holiday's HIV status raises a genuine issue

---

[7] The cases also rely on *Wurzel v. Whirlpool Corp.*, 482 F. App'x 1, 15 (6th Cir. 2012). That case is completely inapposite because it focuses on the separate issue of the direct threat defense, which Defendant acknowledges it is not asserting. *Id.* at 11, 35-36.

> of material fact as to whether his subsequent opinion was the product
> of the ADA-mandated individualized inquiry into Holiday's actual
> condition.

*Holiday*, 206 F.3d at 644 (emphasis added). This case is the same. Even if Dr. Brewer believed that Ferrari was on opioids, the only individualized inquiry she did into how those opioids affected him was to contact Dr. Kole, who confirmed that Ferrari could perform the essential functions of the position.

As argued below, the cases cited by Defendant-Appellee are wholly inapposite. *Michael v. City of Troy Police Dep't*, 2014 US Dist LEXIS 149367 (E.D. Mich. Oct. 21, 2014), involved a police officer who had multiple brain tumors. The defendant had the plaintiff undergo over seven hours of testing, to determine his cognitive functioning. Unlike here, the detailed reports were geared to the crucial issue – plaintiff's cognitive functioning. Here, despite the concerns Dr. Brewer raised to Dr. Heckman about "cognitive and physical functioning associated with these meds", *supra*, Ford's doctors did nothing to assess those issues. The only evidence regarding Ferrari's actual ability to function comes from Dr. Kole, *supra*.

As Ferrari also argued below, although these cases are not binding, the reasoning of *Anderson v. GM*, 2014 US Dist LEXIS 127631 (E.D. Mich. Sep. 12, 2014) or *Lafata v. Dearborn Heights School Dist. No. 7*, 2013 US Dist LEXIS 173731 (E.D. Mich. Dec. 11, 2013), is more applicable here. In *Anderson*, the court denied summary judgment where the employer imposed restrictions on an employee.

39

The plant doctor in *Anderson* issued restrictions "after conducting an individualized assessment over a period of several months, which included a review of Plaintiff's medical records, multiple physical examinations, and numerous discussions with Plaintiff." *Id*. at *24. However, the court found this was insufficient and denied summary judgment.

In *Lafata*, the district court granted summary judgment to plaintiff even though defendant purported to rely on a third-party evaluation that diagnosed the plaintiff with a condition and recommended restrictions. The doctor did an examination of the plaintiff and sought a second opinion. However, the defendant's arguments failed because the physical examination was only "cursory" and the employer had evidence that contradicted the outside doctor's opinion, including plaintiff's own statement he could perform the job and a statement from his doctor.

In granting summary judgment in this case the trial court did not credit evidence that Ferrari was not using opioids. Likewise, the court never considered whether Dr. Brewer's restrictions – the <u>only</u> reason Ferrari was estopped from performing any job functions – were warranted by his medical condition. Rather, the court held that "the <u>only</u> material question is whether defendant's doctors considered the information in front of them…in making the determination that plaintiff required restrictions". (Opinion, RE 45, Page ID # 1299-1328, p. 18) (emphasis added) And, having narrowed its inquiry, the court drew factual inferences in favor of the movant

and deemed it sufficient to compel summary judgment that Dr. Brewer and Dr. Friedman "reasonably determined that plaintiff was still either actively on opioids or in the process of weaning himself…and as a result, they placed restrictions on plaintiff related to the opioid use and weaning process." (Opinion, RE 45, Page ID # 1299-1328, p. 20) But, in fact Dr. Friedman did not make the determinations the court attributed to him, he was uncertain if Ferrari was on medications and did not specify restrictions. (Plaintiff's Exhibit L, Friedman report, under seal, p. 1387) And Dr. Brewer's determinations were premised on ignoring evidence from Ferrari and Dr. Kole, *supra* – evidence which the trial court also did not credit. Rather, the court solely credited Defendant-Appellee's account and drew all inferences in favor of Defendant-Appellee Ford, contrary to law.

In a holding, without citation to the record or any evidence of any kind, the trial court held:

> Prescription opioids carry with them a significant risk of addiction as well as potentially lengthy and/or difficult withdrawal symptoms. It is entirely possible for concerns about addiction or withdrawal resulting from long-term use of opioids to be separate from concerns about the underlying condition that resulted in the use of the opioids to begin with.

(Opinion, RE 45, Page ID # 1299-1328, p. 26) First, "possible" is not sufficient to compel summary judgment. Moreover, none of this applied to Ferrari. The undisputed evidence is that Ferrari was not addicted, was not suffering any adverse side effects, did not need detoxification, was not suffering from withdrawal

symptoms, was not expected to suffer from withdrawal symptoms, and was able to do all the RMI job functions. The trial court drew every inference in favor of Ford, finding that an employer's inchoate "concerns" about of drug use will, as a matter of law, render a disabled employee unqualified under the ADA, even in the absence of <u>any</u> record evidence that the employee is drug addicted or suffering any deleterious effects of prescription drug use.

> b.  <u>There is a question of fact that Ferrari could be reasonably accommodated.</u>

This case differs from a normal ADA case because it is the employer who created restrictions. Ferrari and his doctors dispute that he needed any restrictions, but even if a jury were to find that he did, he could have performed the essential functions of his position. As a person with a record of a disability, Ferrari was entitled to reasonable accommodations. "An individual with a record of a substantially limiting impairment may be entitled, absent undue hardship, to a reasonable accommodation if needed and related to the past disability." 29 C.F.R. 1430.2(k)(3).

Even if Ford believed that Ferrari was using opioids, it acknowledged that he was weaning himself. Thus, like the person needing an accommodation to attend follow-up monitoring appointments, Ferrari would have needed minor accommodations while he fully weaned himself from the opioids. In the Sixth Circuit, the interactive process is "mandatory, and both parties have a duty to

participate in good faith." *Kleiber v. Honda of Am. Mfg*., 485 F.3d 862, 871 (6th Cir. 2007). Ford not only failed to engage in the interactive process, it impeded the process by withholding Ferrari's medical records from him. (Emails, RE 36-17, Page ID # 987-992)

By withholding Ferrari's medical records, Ford impeded Ferrari's ability to consider Ford's alleged concerns and proposed less onerous restrictions prior to Ford denying him the apprenticeship. Ford never discussed with Ferrari or his doctors what the weaning process entailed, and never considered or discussed any possible lesser restrictions during the time-limited process. For example, what if Ferrari was occasionally taking a pill at night after a hard day's work? What if he simply had to take a pill every few days because of pain? Given that Ford's only concern can be his working while affected by the medicine, and given that Ford acknowledges that it could accommodate someone with the restrictions assigned to Ferrari for up to a week, the obvious solution would be to set a plan where a) Ferrari worked unrestricted when not taking medicine; and b) Ferrari informed someone that he needed to be kept away from ladders and heights on any day where he had to take a pill.

If Ferrari were simply prevented from climbing ladders or working at heights while on opioids, he could easily have been accommodated. Ternan testified that the only heights at issue, besides ladders, were lifts and catwalks. Employees have to be

tethered for the lifts and could be tethered for the catwalks. (Ternan Deposition, RE 36-9, Page ID # 950-956, pp. 74, 80-81) As to ladder climbing, Ternan acknowledged that a person could be accommodated in such a manner for a week. (*Id*.,p. 69) Ferrari's ladder climbing restriction, if based on his <u>actual</u> opioid use during weaning, could have amounted to <u>much less</u> than a week of restrictions, *supra*. Further, Ferrare would always be supervised by a journeyman, who would have been able to climb ladders and work at heights on the intermittent times it was actually required. (*Id*., pp. 46, 48-49) *See Rosebrough v. Buckeye Valley High Sch*., 690 F.3d 427, 432-33 (6th Cir. 2012) (reversing grant of summary judgment where Defendant did not "state the essential functions of [plaintiff's] training position," and the "position as a trainee" was what was at issue). A number of other RMI job skills do not require climbing ladders or working at heights. Ferrari could have trained on those tasks on any day that he was using opioids prior to being fully weaned. *See Kiphart*, 251 F.3d 573 (reversing district court's entry of judgment as a matter of law for defendant and finding that whether participating in all of the job rotations was an essential function was a question of fact); *Hall*, 857 F.2d at 1079 (holding "the determination of whether physical qualifications are essential functions of a job requires the court to engage in a highly fact-specific inquiry").[8]

---

[8] Contrary to Defendant-Appellee's position, this would not require someone to do additional work. The journeyman would be expected to perform the task by

But, as it had done throughout, the trial court refused to credit this evidence and drew all inferences in favor of Defendant-Appellee, holding as a matter of law that Ferrari could not be reasonably accommodated because ladder climbing was an essential function. It failed to consider relevant precedent from this Circuit. To the extent that Ford's imposed restrictions require some re-allocation of job duties, the Sixth Circuit has required an inquiry into the extent and nature of that re-allocation. *See Henschel v. Clare County Rd. Comm'n*, 737 F.3d 1017, 1023 (6th Cir. Mich. 2013) (reallocation of hauling duty to one other driver does not render accommodation unreasonable); *Keith*, 703 F.3d at 928 (reallocation of duties to other lifeguards not so extensive as to render accommodation unreasonable). The trial court also re-framed Ford's alleged concern regarding opiate use in favor of Defendant-Appellee. Despite the record evidence that Dr. Brewer's concern was Ferrari's cognitive and physical functioning at work, *supra*, the trial court stated: Ford's "exact concern [was] that plaintiff, despite having no physical need to use opioids, had not yet weaning himself from a dependence on them." (Opinion, RE 45, Page ID# 1299-1328, p. 23) The trial court thus never considers Ferrari's evidence that he was <u>not</u> impaired. Moreover, the trial court's reformulation is factually unsupported. The uncontroverted evidence is that Ferrari was <u>not</u>

---

himself if he did not have an apprentice with him and would not be inconvenienced by not having an apprentice for the few tasks that involve ladder climbing.

dependent on prescription drugs. (Kole Letter, RE 36-15, Page ID # 976-977) The

trial court should be reversed and this case remanded.

D.    Ford's proffered non-discriminatory reason for restricting Ferrari and denying him the RMI apprenticeship is his alleged opioid use.

Ford avers that it imposed work restrictions on Ferrari, and subsequently

denied him the RMI apprenticeship, not because of his neck-related disability, but

because of his alleged prescription drug use: "Plaintiff required restrictions due to

opioid usage, not due to an actual or perceived physical mental impairment."

(Defendant's Motion, RE 33, Page ID # 499-879, pp. 13-14) The trial court held that

this prescription drug use was not a disability, a perceived disability, or related to

Ferrari's actual disability. Further, the trial court (uncritically) accepted Ford's

contention that it was motivated in its actions by Ferrari's alleged prescription drug

use and not his disability. Accordingly, the appropriate place to analyze Ford's

imposition of restrictions is within the *McDonnell Douglas* burden-shifting at the

pretext stage. (Plaintiff's Supplemental Brief, RE 42, Page ID # 1239-1251)

E.    The trial court erred in analyzing causation without considering evidence of pretext.

Regardless of the *prima facie* case applied by the trial court, there is nothing

which precludes it from considering countervailing evidence that casts doubt on

Ford's assertion that Ferrari's opioid use was the only motivating factor in the

adverse employment decision. As the trial court acknowledged, Plaintiff-Appellant

46

argued and presented evidence of pretext. (Opinion, RE 45, Page ID # 1299-1328, p. 10 n2; Plaintiff's Supplemental Brief, RE 42, Page ID # 1239-1251) Rather than consider this indirect evidence, the court merely accepted defendant's assertions at face value, ignored contradictory evidence of intent, and held that there was no evidence of causation. (Opinion, RE 45, Page ID # 1299-1328, p. 25) ("defendant was worried solely about plaintiff's potential continued opioid use").

This begs the relevant question: was Ford's reliance on plaintiff's alleged opioid use pretextual? The trial court could have more easily reached this question had it applied the *McDonnell Douglas* indirect evidence scheme, as used by this Circuit in many instances. Consideration of the record evidence demonstrates a question of fact that Ford's worry about "continued opioid use" was pretextual.

A plaintiff may demonstrate pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256. Plaintiff may demonstrate a question of fact that the proffered reason: 1) had no basis in fact; 2) did not actually motivate defendant's conduct; or 3) was insufficient to warrant the challenged conduct. *Zambetti v. Cuyahoga Community College*, 314 F.3d 249, 258 (6th Cir. 2002). Plaintiff may also provide evidence of "circumstances which tend to prove that an illegal motivation was *more* likely than that offered by the defendant." *Manzer v. Diamond Shamrock*

47

*Chemicals Co*., 29 F.3d 1078, 1084 (6th Cir. 1994). That is, Plaintiff need only present circumstantial evidence sufficient to demonstrate a question of fact that it is "'more likely than not' that the employer's explanation is a pretext." *Id*. Plaintiff is not required to present independent evidence of discrimination. At base, "[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Chen v. Dow Chem. Co*., 580 F.3d 394, 400 n4 (6th Cir. 2009).

The *prima facie* case combined with sufficient evidence for the trier of fact to disbelieve the employer's proffered reason may suffice to show intentional discrimination. "Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination." *Reeves v. Sanderson Plumbing Products, Inc*., 520 U.S. 133, 147 (2000) (internal citation omitted); s*ee also Scott v. Goodyear Tire & Rubber Co.*, 160 F.3d 1121, 1129-30 (6th Cir. 1998), (evidence of plaintiff's *prima facie* case demonstrated pretext). It is enough if Plaintiff presents evidence that Defendant's proffered reason is not worthy of credence. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 433-34 (6th Cir. 2002). *Sutherland v. Michigan Dep't of Treasury*, 344 F.3d 603, 615 (6th Cir. 2003) ("it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation") (emphasis in the original). "At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation." *Chen*, 580 F.3d at 400

n. 4.

Regardless of the employer's alleged honest belief, "the reasonableness of an employer's decision may be considered to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." *Wexler*, 317 F.3d at 576. *See also Dubey v. Stroh Brewery Co.*, 185 Mich. App. 561, 565-66 (1990) (Michigan law requires inquiry into the truthfulness of the employer's proffered reason). There is a question of fact whether Ford's decision to issue blanket restrictions on Ferrari working at heights or climbing ladders was a reasonable response to a concern about "possible" opioid use. As Plaintiff-Appellant argues herein, the evidence demonstrates a question of fact whether Ferrari was using opioids, *supra*. And if Ferrari was using opioids, there is no dispute that it had no effect on his cognitive or physical functions and he was not suffering from side effects, Ford's expressed concerns, *supra*. Further, there is a question of fact that Ferrari's alleged opioid use at work and Ford's concerns about working at heights and climbing ladders could have been accommodated with less drastic restrictions, *supra*. There is a question of fact that Ford's imposition of blanket restrictions on Ferrari was unreasonable and not tailored to Ford's actual concerns about Ferrari's alleged opioid use.

Similarly, plaintiff's disputation of the facts underlying the adverse employment action is evidence of pretext. *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428,

437 (6th Cir. 2009) (finding a question of fact as to pretext where plaintiff "contest[ed] the facts underlying the incident that led to his termination"). As set forth herein, Ferrari and his doctors dispute the alleged facts leading to Dr. Brewer's imposition of restrictions, including use of opioids, any deleterious effects <u>on Ferrari</u> from opioids, his ability to perform the duties of the RMI apprenticeship, and the availability of reasonable accommodations, *supra*.

Further, in ruling on causation, the trial court again impermissibly drew factual inferences in favor of movant. In holding that Ferrari's disability could not be a "but for" cause, the trial court stated: "[o]n February 27, 2013, Dr. Brewer put in place two restrictions that were identical to the two restrictions she place on December 6, 2012, but for a different reason entirely: plaintiff's opioid use and the resultant weaning process, not his neck injury." (Opinion, RE 45, Page ID # 1299-1328, p. 27) But precedent in this Circuit holds that a defendant's inconsistency in its proffered reason is evidence of pretext. *Thurman v. Yellow Freight Sys., Inc.,* 90 F.3d 1160, 1167 (6th Cir. 1996) ("An employer's changing rationale for making an adverse employment decision can be evidence of pretext"); *Cicero v. Borg–Warner Auto., Inc.,* 280 F.3d 579, 592 (6th Cir. 2002) ("[s]hifting justifications over time calls the credibility of those justifications into question"); *Asmo v. Keane, Inc.*, 471 F.3d 588, 596 (6th Cir. 2006) (inconsistency between what employer told plaintiff and what it asserted in lawsuits "is suspicious and is evidence of pretext"); *Duchon*

*v. Cajon Co.*, 791 F.2d 43, 46 (6th Cir. 1986); *Chichewivz v. UNOVA Indus. Auto Sys., Inc.,* 92 Fed. Appx. 215, 220 (6th Cir. 2004). While noting that Ford changed its reasons for imposing restrictions mid-stream, the trial court inexplicably drew an inference in <u>favor</u> of Ford that such change in justification could <u>only</u> demonstrate Ford's good intent, her pure motives. It is undisputed that the neck restrictions were unnecessary, as doctor after doctor attested. (Plaintiff's Exhibit J, medical clearances under seal; Plaintiff's Exhibit K, FCE report under seal; Plaintiff's Exhibit L, Friedman report, under seal) It is also undisputed that Dr. Brewer knew they were unnecessary. (Emails, RE 36-13, Page ID # 968-970) And it is further undisputed that Dr. Brewer continued and <u>adapted</u> two unnecessary restrictions only after consulting Ternan, the RMI supervisor. (Plaintiff's Exhibit N, Medical Records under seal; Ternan Deposition, RE 36-9, Page ID # 950-956, pp. 51-52) <u>After</u> that consultation, she changed "no overhead work" to "no working at heights". (Plaintiff's Exhibit I, medical records under seal, p. 515) Presented with these facts, a jury could credibly draw an inference that Ford was intent on continuing the unnecessary restrictions through any justification it could invent, thus keeping Ferrari out of the RMI apprenticeship.

Moreover, a jury could certainly find that Dr. Brewer's first disability-based restrictions demonstrate Ford's <u>actual</u> concern, Ferrari's record of neck-based disability. Such an inference is strengthened by Dr. Brewer's <u>own</u> statements to Dr.

Heckman that workers' compensation "was "concerned with a new date of injury if restrictions are lifted". (Emails, RE 36-13, Page ID # 968-970) *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 356 (6th Cir. 1998) (discriminatory comments are evidence of pretext and "buttress other evidence of pretext"). If the jury were to hear these remarks in conjunction with other pretext evidence, "then they might find that [Defendant's] proffered reasons 'did not actually motivate the defendant's challenged conduct.'" *Carter v. Univ. of Toledo*, 349 F.3d 269, 276 (6th Cir. 2003).

The trial court also improperly drew inferences in favor of movant when it considered Dr. Brewer's hiding information from Ferrari. It is undisputed that Dr. Brewer refused to give Ferrari his medical records so that he could not remedy Ford's alleged concerns about his alleged opioid use. (Emails, RE 36-17, Page ID # 987-992) "Dr. Brewer worked with Ford management employees to ensure that plaintiff would not have time to go to Dr. Kone and be taken off of the prescription opioids". (Opinion, RE 45, Page ID # 1299-1328, p. 25) The trial court, again, held that this could <u>only</u> be evidence of Ford's good intent and pure motives. *Id*. Yet, if Dr. Brewer were, in fact, concerned with cognitive and physical deficits caused by, or side effects from, opioid use, it was only to Ford's and Ferrari's benefit that he be told of these concerns so that he could alleviate them. Further, by withholding information, Ford failed to engage in the interactive process and denied Ferrari the

ability to discuss the possibility of less onerous – but equally effective – restrictions, *supra*. Dr. Brewer's instruction to Beggs to withhold Ferrari's medical file so that he could not address Ford's alleged concerns could certainly allow a jury to infer that Ford was intent on continuing unnecessary restrictions through any justification it could invent.

Moreover, Defendant-Appellee has never explained how its concerns with cognitive and physical deficits caused by, and side effects from, opioid use, presumptively disqualify Ferrari for the RMI apprenticeship – where he had to constantly work with and be supervised by an RMI technician – but allow him to work on the production floor in one of the most physically demanding positions in the plant. Despite Ford's alleged concerns with Ferrari's opioid use, Ford placed Ferrari in a position working with axle shafts that could weigh in excess of 50 pounds and which included actual "overhead work" – a position out of his job classification and contrary to Dr. Brewer's restriction of "no overhead work" and Dr. Brewer's assertion that "I'm not comfortable with somebody taking morphine and working in a plant, period." (Ferrari Deposition, RE 36-2, Page ID 916-934, pp. 88-90, 117; Interrogatory Answers, RE 36-23, Page ID # 1010-1013; Brewer Deposition, RE 36-31, Page ID # 1093-1099, p. 44) A jury could infer that Dr. Brewer's work restrictions were specifically formulated to keep Ferrari from the skilled trades job

– as they did not serve to keep him out of an equally theoretically dangerous job on the production floor.

As Plaintiff argued below, and demonstrates here, there is sufficient evidence of pretext to demonstrate a question of fact on the issue of Ford's motivation and intent in placing Ferrari on restrictions and denying him the RMI apprenticeship. The very purpose of the *McDonnell Douglas* tri-partite test is to determine causation. If the elements are met, then causation is established, *Goostree*, 796 F.2d at 864. By not considering evidence of pretext, no matter the *prima facie* case applied, the trial court denied Ferrari the opportunity to demonstrate a question of fact as to pretext and, thus, causation. *McDonnell Douglas Corp. v. Green*, 411 U.S. at 805. ("respondent must be given a full and fair opportunity to demonstrate by competent evidence that the presumptively valid reasons for his rejection were in fact a coverup for a racially discriminatory decision"). The trial court improperly ignored record evidence presented by Plaintiff-Appellant below which casts doubt on Ford's stated motivation and intent. Application of the correct law, and the correct standard, to the evidence adduced below requires reversal of the trial court.

## III.    The trial court improperly granted summary judgment on Ferrari's FMLA claim

The trial court dismissed Ferrari's FMLA retaliation claim, finding there was no evidence that Dr. Brewer or anyone at the Van Dyke plant knew of his FMLA leave. (Opinion, RE 45, Page ID # 1299-1328, pp. 28-29) The trial court, again,

ignored record evidence which illustrated that, at the time she imposed the unnecessary work restrictions, Dr. Brewer was aware that Ferrari was returning from medical leave. In her notes from December 2, 2012, Dr. Brewer states that Ferrari was "referred to clinic for RTW exam". (Plaintiff's Exhibit E, medical notes under seal, p. 1047) She further states that Ferrari's psychiatrist "just released him to RTW 12/3/12 w/o restrictions after a medical leave since June 2012". (*Id*.) She also noted her "[e]xtensive review of numerous documents sent by plant (over 70 pages)". (*Id*., at p. 1048) And, in her January 16, 2013 notes, she stated Ferrari "was RTW on 12/4/12 after a protracted psychiatric medical leave". (Plaintiff's Exhibit M, Restriction Report under seal, p. 506) A jury could infer that Dr. Brewer's knowledge of Ferrari's "medical leave" extended to his FMLA leaves, which were documented in his personnel records.

## CONCLUSION

For the reasons stated herein, Plaintiff-Appellant requests that this honorable Court reverse the trial court's grant of summary judgment in its entirety and remand to the trial court for trial of this matter.

Respectfully submitted,

/s/CHARLOTTE CROSON_____
NACHTLAW, P.C.
Attorney for Plaintiff-Appellant
101 North Main Street
Suite 555
Ann Arbor, MI 48104
(734) 663-7550
f (734) 663-7592
ccroson@nachtlaw.com

Date:  August 16, 2015

## Certificate of Compliance

STATE OF MICHIGAN            )

                             ) s.s.

COUNTY OF WASHTENAW )

Charlotte Croson, being duly sworn, certifies that the attached Brief on Behalf of the

Plaintiff-Appellant contains 12,754 words and is in compliance with the Type-

volume Limitations of F.R.A.P. 32(a)(7).

(signature of counsel)

Subscribed and sworn to before me
On August 17, 2015

Joni Brezinski
Notary Public, Washtenaw County, MI
My commission expires: _Jan 26, 2021_

> JONI BREZINSKI
> Notary Public - Michigan
> Jackson County
> My Commission Expires Jan 26, 2021
> Acting in the County of Washtenaw

i

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 17, 2015, I electronically filed the foregoing

papers with the Clerk of the Court using the ECF system, which will send

notification of such filing to the following ECF participants:

ELIZABETH HARDY (P37426)
JULIA TURNER BAUMHART (P49173)
KIENBAUM OPPERWALL HARDY & PELTON, P.L.C.
Attorneys for Defendant
280 N. Old Woodward Avenue
Suite 400
Birmingham, MI 48009
(248) 645-0000
ehardy@kohp.com
jbaumhart@kohp.com


/s/CHARLOTTE CROSON_____
NACHTLAW, P.C.
Attorney for Plaintiff-Appellant
101 North Main Street
Suite 555
Ann Arbor, MI 48104
(734) 663-7550
f (734) 663-7592
ccroson@nachtlaw.com

**ADDENDUM**
**DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS**

| R1 | Complaint, Page ID # 1-15 |
|---|---|
| **R33** | Motion for Summary Judgment, Page ID # 499-879<br><br><u>Exhibits</u><br><br>A) Plaintiff's Deposition Transcript, RE 33-2, Page ID # 537-673<br><br>B) EEOC Dismissal, RE 33-3, Page ID # 674-677<br><br>C) Excerpts from Thomas Ternan Deposition Transcript, RE 33-4, Page ID # 678-692<br><br>D) Excerpts from Dr. Athelia Brewer Deposition Transcript, RE 33-5, Page ID # 693-736<br><br>E) Declaration of Rob Shaver, RE 33-6, Page ID # 737-763<br><br>F) Excerpts from Dr. Kole Deposition Transcript, RE 33-7, Page ID # 764-773<br><br>G) Excerpts from Dr. David Calton Deposition Transcript, RE 33-8, Page ID # 774-780<br><br>H) Declaration of Athelia Brewer, M.D., RE 33-9, Page ID # 781-794<br><br>I)  Excerpts from Linda Beggs Deposition Transcript, RE 33-10, Page ID # 795-798<br><br>J)  Declaration of Thomas R. Ternan, RE 33-11, Page ID # 799-803<br><br>K) Unpublished cases, RE 33-12, Page ID # 804-879 |

| | |
|---|---|
| **R36** | Response to Motion for Summary Judgment, Page ID # 883-1099 |

<u>Exhibits</u>

A) Ferrari Deposition Transcript Excerpts, RE 36-2, Page ID # 916-934

B) UAW-Ford CBA Skilled Trades Agreement, RE 36-3, Page ID # 935-938

C) Employee Records, RE 36-4, Page ID # 939-941

D) Medical Leaves, RE 36-5, Page ID # 942-943

F) Return to Work, RE 36-6, Page ID # 944-945

G) Return to Work, RE 36-7, Page ID # 946-947

H) Return to Work, RE 36-8, Page ID # 948-949

O) Ternan Deposition Transcript Excerpts, RE 36-9, Page ID # 950-956

P) Heckman Deposition Transcript Excerpts, RE 36-10, Page ID # 957-961

Q) Kole Deposition Transcript Excerpts, RE 36-11, Page ID # 962-964

R) Emails, RE 36-12, Page ID # 965-967

S) Emails, RE 36-13, Page ID # 968-970

T) Brewer Dep. Ex. 18, RE 36-14, Page ID # 971-75

V) Kole Letter, RE 36-15, Page ID # 976-977

W) Heckman Deposition Transcript Excerpts, RE 36-16, Page ID # 978-986

X)  Emails, RE 36-17, Page ID # 987-992

Y) Brewer Dep. Ex. 1, RE 36-18, Page ID # 993-994

Z) Restriction Reports, RE 36-19, Page ID # 995-998

AA)  Beggs Deposition Transcript Excerpts, RE 36-20, Page ID # 999-1001

iv

| | |
|---|---|
| | BB) Heckman Dep. Ex. 1, RE 36-21, Page ID # 1002-1005 |
| | CC) Ferrari Dep. Ex. 16, RE 36-22, Page ID # 1006-1009 |
| | DD) Ford's Response to Second Set Interrogs. No. 4, RE 36-23, Page ID # 1010-1013 |
| | EE) *McDonald v Pennsylvania*, RE 36-24, Page ID # 1014-1027 |
| | FF) *Koci v. Cent. City Optical Co.*, RE 36-25, Page ID # 1028-1033 |
| | GG) *Garnett-Bishop v NY Cmty Bancorp, Inc.*, RE 36-26, Page ID # 1034-1059 |
| | HH) Kole CV, RE 36-27, Page ID # 1060-104 |
| | II) *Anderson v. GM*, RE 36-28, Page ID # 1065-1076 |
| | JJ) *LaFata v. Dearborn Heights School Dist. No. 7*, RE 36-29, Page ID # 1077-1089 |
| | KK) Calton Deposition Transcript Excerpts, RE 36-30, Page ID # 1090-1092 |
| | LL) Brewer Deposition Transcript Excerpts, RE 36-31, Page ID # 1093-1099 |
| **R37** | Sealed Exhibits for Response to Motion for Summary Judgment, Page ID # N/A – Filed Under Seal |
| | E) Medical Notes |
| | I) Medical Records, Visit Summary Report |
| | J) Medical Clearances |
| | K) FCE Report |
| | L) Dr. Friedman's Report |
| | M) Restriction Report |
| | N) Medical Records, Visit Summary Report |
| | U) Medical Records, Dr. Calton |

| | |
|---|---|
| **R39** | Reply to Response for Motion for Summary Judgment, Page ID # 1148-1232<br><br>Exhibits<br><br>L) Unpublished Cases, RE 39-2, Page ID # 1159-1208<br>M) Excerpts from Dr. Brewer's Deposition Transcript, RE 39-3, Page ID # 1209-1219<br>N) Excerpts from Dr. Kole's Deposition Transcript, RE 39-4, Page ID # 1220-1226<br>O) Excerpts from Linda Begg's Deposition Transcript, RE 39-5, Page ID # 1227-1229<br>P) Excerpts from Tom Ternan Deposition Transcript, RE 39-6, Page ID # 1230-1232 |
| **R40** | Order Requesting Additional Briefing on the Prima Facie Standard, Page ID # 1233-1236 |
| **R42** | Supplemental Brief by Plaintiff, Page ID # 1239-1251 |
| **R43** | Supplemental Brief by Defendant, Page ID # 1252-1294<br><br>Exhibit<br><br>Q) Unpublished Cases, RE 43-2, Page ID # 1266-1294 |
| **R45** | Opinion and Order Granting Defendant's Motion for Summary Judgment, Page ID # 1299-1328 |
| **R46** | Judgment, Page ID # 1329 |
| **R49** | Notice of Appeal, Page ID #1343 |
| **R53** | 01/26/2015 Motion Hearing Transcript, Page ID # 1348-1411 |

vi